**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GILMAN FEED COMPANY, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>CF INDUSTRIES HOLDINGS, INC.; CF INDUSTRIES INC.; KOCH, INC., KOCH INDUSTRIES, LLC; KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; NUTRIEN LTD.; NUTRIEN AG SOLUTIONS, INC.; THE MOSAIC COMPANY; CANPOTEX LTD.; YARA INTERNATIONAL ASA; and YARA NORTH AMERICA, INC.,<br><br>Defendants. | CIVIL ACTION NO. ____________<br><br>**Jury Trial Demanded**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Gilman Feed Company, Inc. ("Gilman Feed" or "Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), files this Class Action Complaint ("Complaint") against Defendants: CF Industries Holdings, Inc. and CF Industries Inc. (together, "CF"); Koch, Inc., Koch Industries, LLC (f/k/a Koch Industries, Inc.), Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, and Koch Agronomic Services, LLC (together, "Koch"); Nutrien Ltd. and Nutrien Ag Solutions, Inc. (together, "Nutrien"); The Mosaic Company ("Mosaic"); Canpotex Ltd. ("Canpotex"); and Yara International ASA and Yara North America, Inc. (together, "Yara") (CF, Koch, Nutrien, Mosaic, Canpotex and Yara are collectively referred to as the "Defendants"). Plaintiff, upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to Sections 1 and 3 of the Sherman Act and demands a trial by jury on all matters so triable.

## I. INTRODUCTION

1. Defendants are some of the largest producers and sellers of nitrogen (N) fertilizers, phosphorus (P) fertilizers, and potassium (K) fertilizers (collectively referred to herein as "NPK Fertilizers") in the world. They are direct competitors who control 80-90% of the market for NPK Fertilizers in the United States.

2. This action arises from Defendants' ongoing conspiracy to fix, raise, maintain, and/or artificially stabilize prices for NPK Fertilizers in the United States from at least January 1, 2021 through the time that their misconduct and its anticompetitive effects cease (the "Class Period").

3. As set forth in this Complaint, Defendants' anticompetitive conduct and unlawful agreements have caused the prices paid for NPK Fertilizers in the United States to rise to, and stay at, supracompetitive levels. The sharp increases in NPK Fertilizer prices dates back to 2021 when overall prices increased by more than 60%, a number that included an increase of 95% for nitrogen and an increase of more than 70% for potassium (potash).[1]

4. Combined with Defendants' conduct, the structure and characteristics of the U.S. market for NPK Fertilizers supports a reasonable inference that, as alleged herein, the Defendants entered into an illegal conspiracy: supply side concentration; a standardized product; opportunities to collude; high barriers to entry; inelastic demand; unconcentrated demand side; and a history of antitrust misconduct in the industry.

5. With this backdrop, on March 4, 2026, news reports indicated that the United Sates Department of Justice, Antitrust Division (the "DOJ"), began an investigation into whether producers of NPK Fertilizers (including Defendants) colluded to raise prices in violation of the

---

[1] Potassium fertilizer is commonly referred to as potash.

antitrust laws.[2] One report noted that "the U.S. fertilizer industry underwent dramatic consolidation over four decades" and referenced 2021 "when fertilizer costs surged dramatically."[3] It continued that "[p]rices U.S. farmers paid for fertilizers increased over 60%, with nitrogen fertilizer prices jumping 95% and potash prices rising over 70%, according to USDA figures" estimating that "[t]he increases added an estimated $128,000 in costs per farm for feed grain operations in 2022."[4]

6. As a result of Defendants' unlawful agreements, Plaintiff Gilman Feed and all other United States direct purchasers of NPK Fertilizers (including agricultural retailers, fertilizer mixers, members of farming associations, farm and planting partnerships/companies, and individual farmers/growers) were harmed.

7. Therefore, Plaintiff brings this lawsuit on behalf of itself and all members of the proposed Class seeking both monetary and injunctive relief for harms arising from Defendants' unlawful and ongoing agreement to fix, raise, maintain, or stabilize the prices for NPK Fertilizers sold and purchased throughout the United States and its territories, from January 1, 2021 to the present day, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

## II. JURISDICTION AND VENUE

8. Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages suffered by the Class (including the costs of suit and including reasonable attorneys' fees), to enjoin Defendants' anticompetitive conduct, and for

---

[2] *See* Frank DeMatteo, *Justice Department Probes Fertilizer Giants for Possible Price Collusion*, Yahoo! Fin. (Mar. 4, 2026), https://finance.yahoo.com/news/justice-department-probes-fertilizer-giants-192006014.html.

[3] *Id*.

[4] *Id*.

such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

10. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

11. This Court has personal jurisdiction over each Defendant in accordance with Section 12 of the Clayton Act (15 USC § 22) because each Defendant has transacted business, maintained substantial contacts or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the United States, including within this District.

## III. PARTIES

### A. Plaintiff

12. Plaintiff, Gilman Feed Company, Inc., a dealer for agricultural feed, seed, fertilizers, and chemicals, maintains its principal place of business at 400 North Railroad Avenue, Gilman, Wisconsin.

13. During the Class Period, Plaintiff Gilman Feed purchased NPK Fertilizers at supracompetitive prices directly from one or more of the Defendants.

### B. Defendants

#### 1. CF

14. **Defendant CF Industries Holdings, Inc. ("CF Holdings")** is a publicly traded company listed on the New York Stock Exchange (NYSE: CF) and is headquartered at 2375 Waterview Drive, Northbrook, Illinois 60062. It produces nitrogen-based NPK Fertilizers for sale throughout the United States and the United Kingdom. At all relevant times, CF Holdings sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled subsidiaries and/or affiliates, to purchasers in the United States.

15. **Defendant CF Industries Inc. ("CF Industries")** is a wholly owned subsidiary of CF Holdings with its principal place of business also located at 2375 Waterview Drive, Northbrook, Illinois 60062. CF Industries serves as the primary operating subsidiary of CF Holdings. At all relevant times, CF Industries sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

#### 2. Koch

16. **Defendant Koch, Inc**. is a privately held Kansas corporation with a principal place of business at 411 East 37th Street North, Wichita, Kansas, 67220. Koch, Inc. owns a diverse group of companies including, but not limited to, fertilizers, refining, chemicals and biofuels; forest and consumer products; commodity trading; and investments. Koch, Inc. is the ultimate parent company for all of the subsidiary and/or affiliate Koch companies named herein.[5] At all relevant times, Koch, Inc., either directly or by way of its wholly owned or controlled subsidiaries and/or affiliates, sold NPK Fertilizers in interstate commerce, to purchasers in the United States.

---

[5] *See* Schedule 13D/A, Koch, Inc. (filed with the U.S. SEC July 29, 2024), https://www.sec.gov/Archives/edgar/data/1898496/000119312524193118/d856673dsc13da.htm (discussing corporate reorganization).

17. **Defendant Koch Industries, LLC (formerly known as Koch Industries, Inc.) ("Koch Industries")** is a Kansas limited liability company and a wholly owned subsidiary of Koch, Inc. with a principal place of business at 4111 East 37th Street North, Wichita, Kansas, 67220. At all relevant times, Koch Industries, either directly or by way of its wholly owned or controlled subsidiaries and/or affiliates, sold NPK Fertilizers in interstate commerce, to purchasers in the United States.

18. **Defendant Koch Ag & Energy Solutions, LLC ("Koch Ag")** is a wholly owned subsidiary of Koch Industries that is headquartered at 4111 East 37th Street North, Wichita, Kansas, 67220. At all relevant times, Koch Ag, either directly or through its wholly owned or controlled subsidiaries and/or affiliates, sold NPK Fertilizers in interstate commerce to purchasers in the United States.

19. **Defendant Koch Fertilizer, LLC ("Koch Fertilizer")** is a wholly owned subsidiary of Koch Ag that is headquartered at 4111 East 37th Street North, Wichita, Kansas 67220. Koch Fertilizer and its affiliates are major global producers and marketers of fertilizers, including ammonia, urea, urea-ammonium nitrate ("UAN"), phosphate, potash, and sulfur-based products, producing over 12 million metric tons of fertilizer annually. At all relevant times, Koch Fertilizer either directly or through its wholly owned or controlled affiliates, sold NPK Fertilizers in interstate commerce to purchasers in the United States.

20. **Defendant Koch Agronomic Services, LLC ("KAS")** is a subsidiary of Koch Ag and Koch Industries. KAS is a leading manufacturer of nitrogen-based NPK Fertilizers in the United States and is headquartered at 4111 East 37th Street North, Wichita, Kansas 67220. At all relevant times, KAS sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**3. Nutrien**

21. **Defendant Nutrien Ltd.** is a publicly traded Canadian company with its headquarters at 211 19th Street East, Suite 1700, Saskatoon, Saskatchewan, S7K 5R6. Nutrien is the world's largest potash producer and the second-largest fertilizer company. Nutrien operates six of Saskatchewan's ten potash mines and controls around 60% of North America's potash capacity. At all relevant times, Nutrien, sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled subsidiaries and/or affiliates, to purchasers in the United States.

22. **Defendant Nutrien Ag Solutions, Inc. ("Nutrien Ag")** is a wholly owned subsidiary of Nutrien, has its principal place of business 3005 Rocky Mountain Avenue, Loveland, Colorado, 80538. At all relevant times, Nutrien Ag sold NPK Fertilizers in interstate commerce, directly or through its wholly owned and/or controlled affiliates, to purchasers in the United States.

**4. Mosaic**

23. **Defendant The Mosaic Company ("Mosaic")** is a Delaware-based publicly traded corporation with its headquarters at 101 East Kennedy Blvd., Suite 2500, Tampa, Florida 33602. Mosaic is a leading producer of potash and Phosphorus Fertilizers in North America. At all relevant times, Mosaic sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

**5. Canpotex**

24. **Defendant Canpotex Ltd. ("Canpotex")** is a private export company co-owned by Nutrien, Ltd. and Mosaic Canada Corp Nutrition, LP, a subsidiary of Mosaic. Canpotex's principal place of business is located at 409 Third Avenue South, Suite 700, Saskatoon, Saskatchewan, Canada S7K 5R5. Canpotex is the leading global producer of potash minerals used in NPK Fertilizers, holding about 83% of the United States' potash market. At all relevant times,

Canpotex sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

### 6. Yara

25. **Defendant Yara International ASA ("Yara ASA")** is a publicly traded company, listed on the Oslo Stock Exchange (YAR.OL), with headquarters located at Drammensveien 131, 0277 Oslo, Norway. Yara ASA is leading producer of fertilizers, including NPK Fertilizers, which it markets and distributes globally. At all relevant times, Yara ASA sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled subsidiaries and/or affiliates, to purchasers in the United States.

26. **Defendant Yara North America, Inc. ("Yara NA"),** a wholly owned subsidiary of Yara ASA, is headquartered at 100 North Tampa Street, Suite 3800, Tampa, Florida 33602. Yara NA's main activities include sales, marketing, and distribution. Yara NA offers a comprehensive portfolio of crop nutrition services including nitrogen-based fertilizers and NPK Fertilizers. At all relevant times, Yara NA sold NPK Fertilizers in interstate commerce, directly or through its wholly owned or controlled subsidiaries and/or affiliates, to purchasers in the United States.

### 7. Agents and Unnamed Co-Conspirators

27. Various other persons and entities, not named as Defendants, participated as coconspirators in the unlawful conduct alleged herein and performed acts in furtherance of the conspiracy. These co-conspirators include additional fertilizer producers, distributors, and industry participants involved in the manufacture, marketing, and sale of NPK Fertilizers.

28. Upon information and belief, Defendants and their co-conspirators exchanged competitively sensitive information—including pricing, production, capacity, inventory, and

demand data—and coordinated their conduct through industry associations, joint ventures, and other collaborative mechanisms.

29. Defendants are jointly and severally liable for the acts of their co-conspirators taken in furtherance of the conspiracy.

30. Whenever reference is made to any act of any corporation, the allegation means that the corporation acted through its officers, directors, employees, agents, or representatives acting within the scope of their authority.

31. Defendants are also liable for the acts of their subsidiaries, affiliates, predecessors, and successors during the Class Period.

## IV. FACTUAL ALLEGATIONS

### A. Background of NPK Fertilizers

32. Modern agriculture depends heavily on three essential nutrients that plants must have in large quantities: nitrogen (N), phosphorus (P), and potassium (K). These nutrients are supplied to crops through what farmers commonly call nitrogen, phosphate, and potash fertilizers referred to herein as NPK Fertilizers (after the chemical symbols for the nutrients they contain). Together these essential nutrients form the basis of most fertilizer programs around the world.

33. NPK Fertilizers may be applied individually or in blended formulations depending on crop and soil requirements. A blended formulation is a physical mixture of two or more NPK Fertilizers that are combined to provide a balanced nutrient profile in a single product, allowing the nutrient ratio to be customized for specific crops or soil conditions.

34. The United States is one of the largest consumers of NPK Fertilizers in the world. The market for NPK Fertilizers in the United States is valued at just over $31 billion and is projected to grow to nearly $40 billion by 2031. The global fertilizer market is valued at just over $425 billion.

35. Fertilizer demand in the United States is driven mainly by the intensive large-scale cultivation of row crops[6] — particularly corn and soybeans — which account for the majority of planted acreage and fertilizer consumption. Indeed, corn production alone consumes approximately 45% of all nitrogen fertilizer applied domestically. In 2023, U.S. farmers planted approximately 89.9 million acres of corn. Demand for corn-based ethanol as a result of the Renewable Fuel Standard program (requiring U.S. transportation fuel to include a minimum volume of renewable fuels) further intensifies nitrogen fertilizer demand by mandating the conversion of over five billion bushels of corn annually into fuel.

36. Every American farmer who grows corn, soybeans, wheat, or other major crops must purchase NPK Fertilizers each planting season, making these products a non-discretionary input cost that farmers cannot avoid. In other words, there are few substitutes for NPK Fertilizers and demand for NPK Fertilizers is inelastic.

**1. Nitrogen Fertilizers**

37. Nitrogen fertilizers are widely used in agriculture because nitrogen is the nutrient plants require in the greatest quantity. Nitrogen is a key part of chlorophyll, the molecule that enables photosynthesis, and it is also necessary for the formation of proteins and other biological compounds involved in plant growth. Adequate nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yields.

38. Nitrogen fertilizers typically come in three types: Ammonia/Ammonium, Urea, and Nitrate. Nitrogen fertilizer is produced using the Haber–Bosch process. In this process, nitrogen gas from the air is combined with hydrogen, typically derived from natural gas, under conditions

---

[6] Row crops are typically commodity agricultural crops planted in spaced rows wide enough to allow machinery to cultivate, fertilize, and harvest them.

of high temperature and pressure in the presence of a catalyst (such as iron) to produce ammonia gas. That gas is then condensed using cold water to create liquid ammonia, otherwise called anhydrous ammonia. Anhydrous ammonia is a widely used nitrogen fertilizer that contains approximately 82% nitrogen — the highest concentration of any commercial nitrogen fertilizer. Because liquid anhydrous ammonia has hazardous properties, it must be handled carefully and therefore, is used most often in large-scale row crop agriculture where farmers have access to the equipment and infrastructure necessary for safe storage, transport, and soil injection.

39. While anhydrous ammonia is as a fertilizer itself due to its high nitrogen content, it is also used as the basis of other nitrogen fertilizers such as granular urea, urea ammonium nitrate solution ("UAN") and ammonium nitrate ("AN").

40. Urea is a widely used nitrogen fertilizer valued for its high nitrogen content — about 46%. It is typically applied as solid granules or prills and, once in the soil, is converted by microbial processes first into ammonium and then into nitrate, which are forms plants can readily absorb.

41. UAN is a liquid fertilizer consisting of urea and ammonium nitrate dissolved in water, usually containing about 28–32% nitrogen. Because it is a solution, UAN can be applied more uniformly using sprayers, injected into the soil, or delivered through irrigation systems, and it provides a combination of nitrogen forms—urea, ammonium, and nitrate—offering both immediate and slower-release nutrient availability.

42. AN is a widely used nitrogen fertilizer containing about 33–34% nitrogen. It is typically produced as a dry granular product and applied by broadcasting or blending with other fertilizers, and because it supplies both immediately available nitrate and more slowly available ammonium, it provides a balanced and efficient nitrogen source for crops.

**2. Phosphate Fertilizers**

43. Phosphate fertilizers supply phosphorus, an essential nutrient required for several core plant functions. Phosphorus plays an important role in energy transfer within plant cells, including through molecules such as ATP, and contributes to early plant development, root formation, and the production of flowers and seeds. Adequate phosphorus availability is therefore associated with strong root systems and successful crop establishment.

44. Phosphate fertilizers are produced from phosphate rock, a naturally occurring mineral resource mined from geological deposits. After mining, the rock is processed chemically, typically by treatment with acids, to convert the phosphorus into forms that plants can readily absorb. Phosphoric acid is then combined with ammonia to produce the principal finished phosphate fertilizer products: diammonium phosphate ("DAP") and monoammonium phosphate ("MAP"). These fertilizers are generally manufactured as dry granules that can be transported in bulk and applied directly to fields or blended with other nutrients in compound fertilizers.

**3. Potassium Fertilizers**

45. Potassium is a primary plant nutrient required for healthy crop growth. Potassium fertilizers help regulate water movement within plant tissues, activate enzymes involved in metabolism, and support plant tolerance to environmental stresses such as drought or disease. Adequate potassium availability can contribute to improved crop quality and resilience.

46. Potassium fertilizer is commonly referred to as potash. Potash is produced from naturally occurring potash ores formed from ancient, evaporated seas. These mineral deposits are mined from evaporated seas or recovered from brine sources, and then processed to separate potassium-bearing compounds suitable for agricultural use. Potash fertilizers are typically sold as crystalline or granular solids that can be applied directly to fields or blended with other nutrients in compound fertilizers.

47. The most widely used potash fertilizer is potassium chloride, also known as muriate of potash ("MOP"), which is as an agriculturally acceptable mix of potassium chloride (that is 95% pure or greater) with sodium chloride for fertilizer use. Potassium sulfate, also known as sulfate of potash ("SOP"), is also used, particularly for crops that are sensitive to chloride.

**B. Market Demand for NPK Fertilizers**

48. American farms cultivate over 220 million acres of cropland, resulting in an inelastic demand for the type of NPK Fertilizers sold by Defendants. In 2024, the U.S. NPK Fertilizer market was estimated to be valued at almost $30 billion.

49. NPK Fertilizers are favored over other fertilizers because they supply the three macronutrients that crops need in the largest amounts, are highly concentrated, predictable, and fast-acting, allowing farmers to efficiently meet crop nutrient requirements. Unlike organic fertilizers, NPK Fertilizers provide precise nutrient content, are easy to store and transport, release nutrients more quickly into the soil, and are adaptable to most major crops and soil types, making them the primary choice for high-yield, modern agriculture.

**C. Systemic Consolidation of the North American NPK Fertilizer Market**

50. Over the last 40-50 years, the NPK Fertilizer industry has been dramatically consolidated. Prior to the early 1980's, fertilizer production consisted of many relatively small firms. However, beginning in the 1980's and continuing through the 2000's the industry experienced massive consolidation so that what was once a competitive market with many small manufacturers of NPK Fertilizers is now a highly concentrated market, with the handful of named Defendants controlling 80-90% of the United States NPK Market.

51. In the late 1970s and early 1980s there were 56 nitrogen companies, 25 companies that mined phosphate, and 15 potash companies operating in the United States and Canada. Between 1984 and 2008, the number of active ammonia-producing plants that manufacture

Nitrogen Fertilizers decreased from 59 to 22 (a 63% reduction) and the number of firms operating those plants decreased from 46 to 13 (a 72% reduction). By the mid-2000s just six companies controlled 68% of the Nitrogen Fertilizer market. Similarly, consolidation of the Phosphorus Fertilizer market left six companies controlling 88% of the market. And by 2000, just two companies (that formed a Canadian oligopology), controlled 85% of the potash market.

52. The market was further constrained over the next decade. As of 2018, the four largest Nitrogen Fertilizer producers controlled 75.3% of total U.S. output, three companies controlled 90% of the phosphorus market, and two firms control nearly 100% of the U.S. potash market. By 2024, there were less than five significant producers in each NPK Fertilizer market and just three companies – Nutrien, Mosaic, and CF Industries – control most of the domestic NPK Fertilizer market.

53. As a result, today each of the major nutrient industries is dominated by a single corporation: Mosaic reigns over the American phosphate market, CF Industries commands the nitrogen sector, and Nutrien along with Mosaic (the two companies are also the joint venture partners who control Canpotex) have taken charge of the North American potash market.

**D. Defendants' Anticompetitive Conduct**

54. In or around 2021, NPK Fertilizer prices began to rise dramatically, significantly deviating from historical norms. Prices spiked throughout 2021 and 2022, remaining high even after supply issues that allegedly caused the initial price increases were resolved. These inflated prices are the result of Defendants' conspiracies and unlawful conduct.

55. By 2021, the prices U.S. farmers paid for fertilizers increased by over 60%. Nitrogen fertilizer prices jumped 95%, while potash prices rose over 70%. These increases in NPK Fertilizer prices added an estimated $128,000 in costs per farm.[7]

**1. Defendants conspired to Increase NPK Fertilizer Prices**

56. Upon information and belief, beginning in or around 2021, Defendants entered into a combination and conspiracy to raise prices, coordinate output restrictions and enforce capacity discipline. Acting collectively, Defendants limited the supply of NPK Fertilizers in the United States by, among other actions: (a) reducing production and available capacity; (b) postponing or constraining production expansions despite historically high prices; (c) managing inventories to sustain artificial scarcity; and (d) refraining from materially increasing output in response to rising prices.

57. In a competitive market, record-high prices would ordinarily prompt a swift and sustained increase in supply. That did not occur here. Instead, Defendants adhered to "capacity discipline," keeping supply in each market constrained even as prices climbed to historic levels.

58. Defendants "managed scarcity" was not accidental. Rather, upon information and belief, Defendants agreed to restrict the supply of NPK Fertilizer. Further, as explained below, the structure of the market facilitated this concerted conduct, as a small number of dominant producers controlled nearly all NPK Fertilizer production in North America.

---

[7] Tyne Morgan, *50% Surge in Fertilizer Prices Adds $128,000 in On-Farm Costs for 2022, Finds Texas A&M Study*, AgWeb (Jan. 12, 2022), https://www.agweb.com/news/crops/corn/50-surge-fertilizer-prices-adds-128-000-farm-costs-2022-finds-texas-am-study; *see also* Michelle Rook, *DOJ Begins Probe of Fertilizer Producers for Collusion: Is It Warranted?*, AgWeb (Mar. 9, 2026), https://www.agweb.com/news/doj-begins-probe-fertilizer-producers-collusion-it-warranted.

59. As such, fertilizer prices have steadily risen, increasing an additional 37% between 2020 and 2025.

**2. NPK Fertilizer Prices Moved in Tandem During the Class Period**

60. Between 2020 and 2021, the wholesale fertilizer index increased by over 60%. These upward trends continued and, by 2022, wholesale fertilizer prices averaged 132% higher than 2020 prices.

61. Publicly available pricing data shows a parallel pattern across NPK Fertilizers – a sharp increase in 2021 to 2022, price decreases in 2023, and renewed increases beginning in 2024 continuing through the present.

62. As a result of Defendants' conspiracy, during the Class Period, NPK Fertilizer purchasers, like Plaintiff and members of the Class, paid higher prices for NPK Fertilizers while Defendants enjoyed record high profits.

**a. Nitrogen Fertilizer Price Increase**

63. Public disclosures by Nutrien show that Nitrogen Fertilizer prices increased sharply from 2021 to 2022. In its 2022 filings, Nutrien reported average net realized selling prices of approximately $973 per metric ton for ammonia in 2022 versus $477 in 2021, a 104% increase; $696 per metric ton for urea in 2022 versus $478 in 2021, a 46% increase; and $402 per metric ton for solutions, nitrates, and sulfates in 2022 versus $238 in 2021, a 69% increase.[8]

64. CF Industries' public disclosures also show similar substantial year-over-year increases in Nitrogen Fertilizer prices from 2021 to 2022. CF Industries 2022 Form 10-K reports

[8] Press Release, Nutrien Ltd., Reports Fourth Quarter and Full-Year 2022 Results, Feb. 15, 2023, https://www.sec.gov/Archives/edgar/data/1725964/000119312523040355/d450102dex991.htm; *see also* Nutrien Ltd., Management's Discussion & Analysis (2022), https://www.sec.gov/Archives/edgar/data/1725964/000119312523048055/d411297dex9921.pdf.

an 88% increase in ammonia prices (from approximately $498 per ton in 2021 to approximately $936 per ton in 2022); a 45% increase in urea prices (from approximately $438 per ton to approximately $633 per ton); a 93% increase in UAN prices (from approximately $272 per ton to approximately $526 per ton); and a 78% price increase for ammonium nitrate (from approximately $297 per ton to approximately $530 per ton).[9]

65. Upon information and belief, Defendants Yara and Koch implemented similar price increases for their Nitrogen Fertilizers during the 2021-2022 time period.

**b. Phosphorus Fertilizer Price Increases**

66. Nutrien's and Mosaic's public financial disclosures also show sharp increases in Phosphate Fertilizer prices beginning in 2021, reaching historically elevated levels in 2022.

67. Nutrien reported that the average net realized selling price for Phosphate Fertilizers it sold in North America increased from approximately $602 per metric ton in 2021 to approximately $806 per metric ton in 2022 – an increase of approximately 34%.[10]

68. Mosaic reported similar price increases in its 2022 annual disclosures, stating that its average selling price for Phosphate Fertilizers increased from approximately $564 per ton in 2021 to approximately $804 per ton in 2022 – an increase of approximately 43%.[11]

69. Recent company disclosures indicate that, after declining from their 2022 peaks, Phosphate Fertilizer prices reversed course and began increasing again. Nutrien reported that its

---

[9] CF Industries Holdings, Inc., Annual Report (Form 10-K), at Item 7 (Results of Operations—Ammonia, Granular Urea, UAN, and AN Segments) (Feb. 23, 2023), https://www.sec.gov/Archives/edgar/data/1324404/000132440423000006/cf-20221231.htm.

[10] *See* Nutrien Ltd., *Management's Discussion & Analysis,* supra note 8, at 45-46 (table reporting "Phosphate" net selling prices).

[11] The Mosaic Company, Annual Report (Form 10-K), at 34 (Feb. 23, 2023), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001285785/c177b49b-a7e5-4f2f-afbc-b1fdc9629748.pdf (table reporting average selling price—phosphates).

North American phosphate selling prices increased from approximately $615 per metric ton in the fourth quarter of 2024 to approximately $677 per metric ton in the fourth quarter of 2025, an increase of approximately 10%.[12] Mosaic similarly reported an approximate 16% price increase over the same period, from $593 per ton to approximately $686 per ton.[13]

**c. Potassium Fertilizer Price Increases**

70. Nutrien's and Mosaic's public financial disclosures also indicate a sharp price increase for Potassium Fertilizer (potash) beginning in 2021, hitting historically elevated highs in 2022.

71. Nutrien reported its average net realized selling price for potash in North America increased from approximately $317 per metric ton in 2021 to approximately $667 per metric ton in 2022 – an increase of approximately 110%.[14]

72. Mosaic reported similar price increases in its 2022 annual disclosures, affirming that its average selling price for potash increased from approximately $285 per ton in 2021 to approximately $632 per ton in 2022 – an increase of approximately 122%.[15]

73. More recent company disclosures indicate that potash prices increased again after declining from 2022 peaks. Nutrien reported that its North American potash selling prices

---

[12] *See* Press Release, Nutrien Ltd., *Nutrien Reports Full-Year 2025 Results and Provides 2026 Guidance* (Feb. 18, 2026), https://www.nutrien.com/news/press-releases/nutrien-reports-full-year-2025-results-and-provides-2026-guidance-1741.

[13] Press Release, The Mosaic Company, *The Mosaic Company Reports Fourth Quarter and Full Year 2025 Results* (Feb. 24, 2026), https://s1.q4cdn.com/823038994/files/doc_financials/2025/q4/Press-Release-Q4-2025-Exhibit-99-1-FINAL.pdf.

[14] Nutrien Ltd., *Management's Discussion & Analysis*, supra note 8, at 38–40 (table reporting potash net selling prices).

[15] *See* The Mosaic Company, Form 10-K, supra note 11, at 36–37 (table reporting "Average Selling Price – Potash").

increased from approximately $270 per metric ton in the fourth quarter of 2024 to approximately $305 per metric ton in the fourth quarter of 2025, an increase of approximately 13%.[16] Similarly, Mosaic reported an increase from approximately $199 per ton to approximately $264 per ton over the same period, an increase of approximately 33%.[17]

### E. Defendants' Justifications for the Price Increases are Insufficient

74. Defendants have attempted to conceal their anticompetitive pricing conspiracy by offering numerous justifications for their NPK Fertilizers price increases, claiming that their price increases during the Class Period were due to general inflation, logistics disruptions, and global supply issues, even blaming the war in Ukraine and the accompanying sanctions on exports from Russia and Belarus.[18]

75. However, these international supply disruptions cannot fully justify the sustained high prices NPK Fertilizer purchasers have experienced.

76. Following the 2022 invasion of Ukraine, potash producers from non-sanctioned countries had an opportunity to boost supply and seize market share from their competitors. This is what economists would expect in a competitive environment, and this competition would have led to any short-term price hike then declining until prices returned to their pre-2022 levels. But that did not happen here. Instead, potash prices remained unjustifiably high, even exceeding prices

[16] *See* Nutrien Ltd., *Nutrien Reports Full-Year 2025 Results and Provides 2026 Guidance* (Feb. 18, 2026), https://www.nutrien.com/news/press-releases/nutrien-reports-full-year-2025-results-and-provides-2026-guidance-1741.

[17] *See* Press Release, The Mosaic Company, *The Mosaic Company Reports Fourth Quarter and Full Year 2025 Results* (Feb. 24, 2026), https://s1.q4cdn.com/823038994/files/doc_financials/2025/q4/Press-Release-Q4-2025-Exhibit-99-1-FINAL.pdf.

[18] Nutrien, *An Explainer: What's driving the cost of fertilizer?* (Aug. 31, 2022), https://www.nutrien.com/news/stories/explainer-whats-driving-cost-fertilizer.

from 2021. Potash producers' refusal to increase their market share and subsequently reduce prices would be contrary to their economic self-interest unless they were deliberately coordinating with their competitors to restrict supply and keep prices elevated.

77. In December 2025, the United States lifted sanctions on Belarusian potash in exchange for the release of political prisoners.[19] This new increase in the supply of a key NPK Fertilizer input should have resulted in lower manufacturing costs and lower prices but despite this development, the market's reaction was minimal, and the reintroduction of this input supply failed to lower potash fertilizer prices.

78. Additionally, Defendants alleged rising input costs do not account for the persistently high prices of Nitrogen Fertilizer. For example, Nitrogen Fertilizer prices remained elevated throughout the Class Period, even when natural gas prices (a key manufacturing impact) reverted to relatively low levels.

79. As a result, prices of NPK Fertilizers "remained stubbornly high" throughout the Class Period, "even as commodity markets softened."[20]

80. Despite Defendants' proffered price increase justifications, and although NPK purchasers had no evidence of Defendants' collusion, the persistently high NPK prices made those purchasers increasingly suspicious that NPK Fertilizer prices were being manipulated. On December 8, 2021, the Family Farm Action Alliance sent a letter to the United States Department of Justice, urging an investigation into the highly consolidated fertilizer sector, concerned about

---

[19] PBS, *Belarus frees prominent political prisoners as U.S. lifts sanctions on country's potash exports* (Dec. 13, 2025), https://www.pbs.org/newshour/world/belarus-frees-prominent-political-prisoners-as-u-s-lifts-sanctions-on-countrys-potash-exports.

[20] RealAgriculture Market Team, *Sticky input prices and short supplies: What's keeping fertilizer costs high?* (Aug. 28, 2025), https://www.realagriculture.com/2025/08/sticky-input-prices-and-short-supplies-whats-keeping-fertilizer-costs-high/.

anti-competitive practices and highlighting the pretextual nature of Defendants' unsubstantiated claims regarding supply issues:

> Claiming a global shortage, fertilizer companies have recently broken records with the ballooning prices they charge for fertilizer. Yet the companies' own documents refute any shortage claims and reveal they have additional capacity they're not utilizing. While it's true that natural gas prices are currently high, Yara's 2021 third quarter report states explicitly that this has had "[l]imited impact on finished fertilizer production to date; Yara is closely monitoring the situation going forward." Nutrien's annual report states that "due to historically low global ammonia prices we curtailed production . . . while maintaining flexibility to respond to improvements in the market condition." Their potash capacity likewise exceeds current production levels, and in 2020 the cash cost to produce potash was $59 per ton, the lowest level on record for Nutrien.[21]

**F. The Fertilizer Industry has been Accused of Engaging in Anticompetitive Conduct in the Past**

81. The fertilizer industry, including Defendants, has a history of being accused of, and investigated for, anticompetitive and unfair business practices dating back to the early 1990s when several potash producers were investigated by the Antitrust Division of the U.S. Department of Justice for price-fixing.[22]

82. Beginning in September of 2008, class actions were filed on behalf of potash purchasers alleging that various global producers of potash collaborated to restrict output and impose price increases. *See In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 916, 919 (N.D. Ill. 2009). Because the plaintiffs' antitrust claims were predicated on allegations that the structure of the market made collusion plausible and allegations that the defendants' price increases could not be explained by a significant uptick in demand, changes in the cost of production, or other changes

---

[21] Letter to DOJ from Joe Maxwell, President of Family Farm Action Alliance (Dec. 8, 2021) https://farmaction.us/wp-content/uploads/2021/12/FFAA_DOJ_Fertilizer_Investigation_Final.pdf.

[22] *Probe of Potash Price Fixing Ends With No Planned Action*, Wall St. J (June 17, 1996), https://www.wsj.com/articles/SB834968145602136000.

in input costs; the Seventh Circuit deemed plaintiffs' claims plausible in *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 849, 858-860 (7th Cir. 2012).

83. Thereafter, potash producers agreed to settle the potash purchasers' antitrust claims. On February 10, 2013, both Mosaic and PotashCorp announced that they each agreed to pay $43.75 million to resolve the claims. Agrium, Inc. agreed to pay an additional $10 million, bringing the total settlement value to nearly $100 million.[23]

84. However, these settlements did not end the scrutiny of anticompetitive practices in the potash industry. In the fall of 2013, the American Antitrust Institute released a monograph analyzing the market power exerted by the few large global producers of fertilizer inputs.[24] The report indicated that these fertilizer inputs were prone to anticompetitive coordination or collusion and concluded "fertilizer producers have likely acted in a coordinated fashion to raise prices, to the detriment of competitors and consumers."[25] The monograph also highlighted how potash producers, through Canpotex, engage in anticompetitive sharing of information related to export prices and volumes.[26]

**G. USDA Investigates Collusion and Price Fixing of NPK Fertilizers**

85. On October 28, 2025, Mark Mueller, President of the Iowa Corn Growers Association ("ICGA"), spoke at a U.S. Senate Committee on the Judiciary hearing on competition in the seed and fertilizer industries. Mr. Mueller emphasized that rising fertilizer costs are severely

---

[23] The Canadian Press, *Big 3 potash miners to pay around $100M to settle U.S. antitrust cases* (Jan. 31, 2013), https://www.cbc.ca/news/canada/saskatchewan/big-3-potash-miners-to-pay-around-100m-to-settle-u-s-antitrust-cases-1.1362975.

[24] American Antitrust Institute, *The Fertilizer Oligopoly: The Case for Global Antitrust* (Oct. 4, 2013), https://www.antitrustinstitute.org/work-product/the-fertilizer-oligopoly-the-case-for-global-antitrust/.

[25] *Id.*

[26] *Id.*

impacting corn growers in Iowa and across the country, emphasizing that "[g]rowers across the country are facing an impossible decision: buy fertilizer or stay solvent."[27]

86. Mr. Mueller's written testimony noted that "it is well past time to stop ignoring the role of the fertilizer monopolies that dominate critical input markets[.]" He explained that, over the past 20 years, manufacturing of nitrogen, phosphorus and potash has consolidated such that "in the United States, we only have four main players across the three products" and further noted that "[o]ver the last few decades this industry has been allowed to consolidate horizontally across the manufacturers. Mergers have gone unchecked, and monopolies have entrenched."[28]

87. As a result, Mr. Mueller noted that the number of corn bushels needed to purchase one unit of monoammonium phosphate surged from an average of 136 bushels to 230 bushels over the past five years for the same unit.[29] This situation exemplifies the intense financial pressure on farmers as fertilizer prices continue to surge while crop revenues stagnate.

88. In December 2025, President Donald Trump issued an Executive Order instructing the U.S. Attorney General and the Chairman of the FTC to establish a Food Supply Chain Security Task Force to investigate price-fixing and anti-competitive practices within the food sector.[30]

---

[27] U.S. Senate Committee on the Judiciary, Hearing on Competition Issues in the Seed & Fertilizer Industries – Written Testimony of Mark Mueller, President of the Iowa Corn Growers Association (Oct. 28, 2025), https://www.grassley.senate.gov/download/mark-mueller-testimony-senate-judiciary-committee-submitted-version.

[28] *Id.*

[29] *Id.*

[30] The White House, *Addressing Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain* (Dec. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/addressing-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/.

89. In January 2026, U.S. Department of Agriculture Deputy Secretary Stephen Vaden publicly stated that Defendants Mosaic and Nutrien had been artificially "constraining supply and driving up the prices that farmers pay" for fertilizers and called it "unacceptable."[31]

90. In February 2026, the ICGA[32] and the Texas Corn Producers Association[33] sent letters to then U.S. Attorney General Pam Bondi seeking clarity regarding the Department of Justice's efforts to investigate and address potential antitrust violations within the fertilizer industry. These letters stated the farmers' belief that the consolidation of the fertilizer industry over the past 20 years has resulted in the continuing rise in fertilizer prices and that such prices were "artificially inflated."

91. According to news reports, the DOJ has opened an investigation into whether NPK Fertilizer producers—Defendants Koch, Nutrien, Mosaic, CF Industries and Yara—colluded to raise prices, potentially violating antitrust laws.[34]

### H. NPK Fertilizer Prices Surged During the Class Period While Input Costs and Demand Declined

92. Before the conspiracy began, increases in NPK Fertilizer prices were usually temporary, with market forces naturally correcting pricing in line with a competitive market.[35]

---

[31] *A Conversation with USDA Deputy Secretary Stephen Vaden*, National Agricultural Law Center (Jan. 21, 2026), at 46:40–47:19 (video).

[32] Iowa Corn Growers Ass'n, Letter to U.S. Attorney General Pam Bondi (Feb. 4, 2026), https://x.com/iowa_corn/status/2019456648654315988.

[33] Texas Corn Producers Ass'n, Letter to U.S. Attorney General Pam Bondi (Feb. 10, 2026), https://texascorn.org/wp-content/uploads/2026/02/TCPADOJStatusLetter_021026.pdf.

[34] Rook, *DOJ Begins Probe of Fertilizer Producers*.

[35] David Widmar, *2020 fertilizer prices — some of the lowest in a decade*, Michigan Farm News (Apr. 7, 2020), https://www.michiganfarmnews.com/2020-fertilizer-prices-some-of-the-lowest-in-a-decade.

However, during the Class Period, NPK Fertilizer prices rose significantly and remained artificially high because of Defendants' actions.

93. As noted above, temporarily increased input costs and other macroeconomic factors do not explain the persistent price increases implemented by Defendants. For example, in 2021, Nutrien's gross manufacturing profit margin was up 669% when compared to 2020, even though its costs of goods sold only increased 58%.

### I. The Structure and Characteristics of the Market for NPK Fertilizers Support the Existence of a Conspiracy

94. Economic literature has explained that in the case of oligopolies, circumstantial evidence regarding market structure and economic actions and outcomes may allow for a finding that competitor price increases go beyond parallel movement and are, in fact, the result of concerted action. These evidentiary factors are referred to collectively as "plus factors."

95. While collusion can occur in almost any industry, it is more likely to occur where the structure of the market has characteristics that render it more susceptible to cartelization and encourage price-fixing efforts, including characteristics present here: market concentration, high entry barriers, inelastic demand and an absence of substitutes, and markets with homogenous (standardized) products. In addition, an inference of anticompetitive agreement among competitors can be supported by evidence that they had an opportunity to conspire.

96. ***Concentration of supply side:*** Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, supplies, or territories. The Defendants are among the largest producers of NPK Fertilizers sold in the United States and together control over 80% of the North American nitrogen fertilizer market and over 90% of the North American phosphate and potash markets. Because the manufacture of NPK Fertilizers is highly concentrated, with the Defendants

controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.

97. ***Standardization***: Markets with homogenous and standardized or commodity-like products are more susceptible to collusive price-fixing agreements than markets with highly differentiated products. NPK Fertilizers are standardized because their nutrients are basic chemical components traded as commodities and used interchangeably, regardless of the specific source. The fact that NPK Fertilizers are commodity products also makes it easier for competing firms to coordinate on a common price structure.

98. ***Opportunities to collude at trade association meetings:*** Collusion also may be facilitated by trade associations where competitors can meet in-person, can exchange competitively sensitive information, and can explicitly agree to collude. Here, Defendants have had multiple opportunities to collude through trade associations to which they belonged and served as board members. For example, all of the Defendants (Koch, Nutrien, Mosaic, Canpotex, CF and Yara), either directly or by way of subsidiary or affiliate companies, are active members of the International Fertilizer Association ("IFA"),[36] a global fertilizer association, headquartered in Paris, France.[37] Chris Bohn (CF Holdings), Bruce Bodine (Mosaic), Kenneth Seitz (Nutrien Ltd.), and Svein Tore Holsether (Yara ASA), are also members of IFA's Board.[38] IFA sponsors a number of recurring in-person trade events including the IFA Annual Conference and the Cultivating Tomorrow Conference.[39]

---

[36] https://www.fertilizer.org/about-ifa/our-members/ (last visited Apr. 29, 2026).

[37] https://www.fertilizer.org/about-ifa/contact-us/ (last visited Apr. 29, 2026).

[38] https://www.fertilizer.org/about-ifa/structure-governance/our-board/ (last visited Apr. 29, 2026).

[39] https://www.fertilizer.org/news-events/events/ (last visited Apr. 29, 2026).

99. Similarly, CF Holdings, Koch Fertilizer, Mosaic, Nutrien Ltd., and Yara NA, are all members and Board members of The Fertilizer Institute ("TFI"), a national fertilizer industry organization headquartered in Arlington, Virginia.[40] In addition to offering exclusive members-only "market volatility information and resources,"[41] TFI also sponsors a number of trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference.[42]

100. All of the Defendants (Koch, Nutrien, Mosaic, Canpotex, CF and Yara), either directly or by way of subsidiary or affiliate companies are members of Fertilizer Canada ("FC"), a Canadian fertilizer industry organization headquartered in Ottawa, Ontario.[43] Additionally, Mosaic, Nutrien, and Yara NA are members of the Board of FC and Koch and CF are represented via directors who work for affiliated companies.[44] FC is an organization representing producers, manufacturers, wholesale and retail distributors of nitrogen, phosphate, potash and sulfur fertilizers.[45]

101. Nutrien Ltd., Mosaic, and Koch (via Koch Sulfur Products Company L.L.C.), are all members and Board members of The Sulfur Institute ("TSI"),[46] a global association for sulfur and sulfuric acid professionals, based in Washington, D.C. TSI sponsors a number of in-person

---

[40] https://www.tfi.org/about-us/leadership/ (last visited Apr. 29, 2026).

[41] https://www.tfi.org/insights/market-intelligence-insights/ (last visited Apr. 29, 2026).

[42] https://www.tfi.org/events/event-calendar/ (last visited Apr. 29, 2026).

[43] https://fertilizercanada.ca/membership/member-directory/ (last visited April 29, 2026).

[44] https://fertilizercanada.ca/about/ (last visited Apr. 29, 2026).

[45] https://fertilizercanada.ca/about/ (last visited Apr. 29, 2028).

[46] https://www.sulphurinstitute.org/about-tsi/member-companies/ (last visited Apr. 29, 2026).

trade events each year, such as the Sulphur World Symposium and its annual Executive Committee Meeting.[47]

102. Both David Bilby (CF Holdings) and Shawn McGreevy (Koch Fertilizer), are Board members of the Fertilizer Industry Round Table ("FIRT"), a fertilizer trade group.[48] Gary Vogen (Yara NA), previously served as a Board member of FIRT.[49] FIRT hosts an annual meeting, in partnership with TFI.[50]

103. Both KAS and Mosaic are members of the Agricultural Retail Association ("ARA"), an industry trade group based in Arlington, Virginia.[51] Additionally, Nathan Packer (Nutrien Ag) and Bob Ness (Mosaic), are members of the Board of ARA.[52] ARA hosts a number of recurring in-person events, including the Annual ARA Conference and Expo,[53] in addition to semi-annual in-person meetings of ARA committees.[54]

104. ***High barriers to entry:*** There are also high barriers to becoming a manufacturer of NPK Fertilizers. A large capital investment is required to enter the industry, as companies wishing to enter must purchase machines and operating space to manufacture NPK Fertilizers. The importance of research and development in the industry also may deter new entrants.

105. Potential entrants to the industry also must make a significant financial investment to acquire, maintain, and update production facilities and equipment. Larger players have an

---

[47] https://www.sulphurinstitute.org/events/tsi-meetings-and-events/ (last visited Apr. 29, 2026).

[48] http://www.firt.org/about/current-board (last visited April 29, 2026).

[49] http://www.firt.org/about/past-member (last visited Apr. 29, 2026).

[50] http://www.firt.org/conferences (last visited Apr. 29, 2026).

[51] https://www.aradc.org/members (last visited Apr. 29, 2026).

[52] https://www.aradc.org/board (last visited Apr. 29, 2026).

[53] https://www.aradc.org/2026-conference-expo (last visited Apr. 29, 2026).

[54] https://www.aradc.org/get-involved (last visited Apr. 29, 2026).

advantage because they are able to build or acquire multiple manufacturing facilities, discouraging others from entering.

106. Thus, the start-up capital necessary to compete with today's NPK Fertilizer manufacturers would be substantial. NPK Fertilizer manufacturers have significant economies of scale, utilizing large and expensive production facilities. Barriers to entry in NPK Fertilizer manufacturing both prevent new competitors from entering the market and make the market susceptible to collusion.

107. **Inelastic demand:** Demand for NPK Fertilizers is inelastic. Industries with inelastic demand, such as the NPK Fertilizers industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

108. A lack of substitute goods may be a characteristic of inelastic demand. NPK Fertilizers cannot be interchanged freely with other goods. Although there are other types of fertilizers, their characteristics makes them not easily substituted for NPK Fertilizers. NPK Fertilizers are unique because they are a commodity product that provides precise, balanced nutrients, rapid soil availability, and broad crop adaptability, making them distinct from other fertilizers.

109. Customers similarly do not view NPK Fertilizers as interchangeable with other fertilizers.

110. ***Unconcentrated demand side:*** The unconcentrated nature of the demand side of the NPK Fertilizers market and lack of buyer power sufficient to stimulate competition also makes the NPK Fertilizer market susceptible to collusion. Such a large number of buyers, each of whom forms a small share of the total marketplace demand, means that there is less incentive for

Defendants to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing agreement carries large penalties.

111. ***History of antitrust violations:*** As discussed in Section IV.F, *supra*, the NPK Fertilizer industry has a history of antitrust scrutiny dating back to the early 1990s and including a major price-fixing litigation that settled for approximately $100 million.

## V. ANTITRUST IMPACT AND DAMAGES TO THE PLAINTIFF AND THE CLASS

112. Because of the Defendants' anticompetitive conduct: (1) competition in the NPK Fertilizers market has been reduced or eliminated, (2) prices for NPK Fertilizers have been maintained at supracompetitive levels, and (3) United States purchasers of NPK Fertilizers have been deprived of the benefit of price competition.

113. As described herein, during the Class Period, Plaintiff directly purchased NPK Fertilizers from the Defendants.

114. As a result of the Defendants' anticompetitive conduct, Plaintiff and Class members paid more for NPK Fertilizers than they otherwise would have and thus suffered antitrust injury and damages. The overcharges paid by Plaintiff and members of the Class for NPK Fertilizers constitutes antitrust injury and harm to competition under the federal antitrust laws.

## VI. CLASS ACTION ALLEGATIONS

115. Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased NPK Fertilizers directly from any of the Defendants or their subsidiaries or affiliates during the period beginning no later than January 1, 2021 until the date on which a class is certified in this case.

Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, and the Court and its staff.

116. ***Numerosity***. While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the class size is so numerous that joinder is impracticable given Defendants' substantial nationwide presence.

117. ***Commonality***. Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making relief with respect to the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

(a) Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of NPK Fertilizers in the United States and its territories;

(b) The identity of the participants in the alleged conspiracy;

(c) The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

(d) Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

(e) Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(f) The effect of the alleged conspiracy on the price of NPK Fertilizers during the Class Period;

(g) Whether the Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

(h) The appropriate injunctive and related equitable relief for Plaintiff and the Class; and

(i) The appropriate class-wide measure of damages.

118. ***Typicality***. Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for fertilizer from Defendants.

119. ***Adequacy***. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

120. ***Predominance***. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

121. ***Superiority***. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII. INTERSTATE TRADE AND COMMERCE

122. Billions of dollars of transactions in NPK Fertilizers are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

123. Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

124. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for NPK Fertilizers in the United States.

125. Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of NPK Fertilizers sold in the United States, the prices of NPK Fertilizers would have been determined by a competitive, efficient market.

## VIII. FRAUDULENT CONCEALMENT

126. Defendants engaged in a successful, illegal price-fixing conspiracy that, by its nature, was inherently self-concealing.

127. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the alleged conspiracy until approximately March of 2026 when governmental investigations about the conspiracy were publicly revealed in the press.

128. Plaintiff and the Class members could not have discovered the alleged contract, combination or conspiracy at an earlier date by the exercise of reasonable diligence, which they did exercise, because of the deceptive practices and techniques secretly employed by Defendants

and their co-conspirators to avoid detection of, and to fraudulently conceal, their contract, combination or conspiracy. While holding themselves out as honest competitors, Defendants fraudulently concealed the contract, combination or conspiracy herein alleged by various means and methods. For example, Defendants made public statements attributing price increases to market forces rather than attributing price increases to the effective implementation of their anticompetitive agreement.

129. The affirmative actions of the Defendants herein alleged were wrongfully concealed and carried out in a manner that precluded detection.

130. By virtue of the fraudulent concealment by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiff and the Class members have as a result of the unlawful contract, combination or conspiracy alleged in this Complaint.

## IX. ANTITRUST INJURY

131. Defendants' antitrust conspiracy had the following effects, among others:

(a) Price competition has been restrained or eliminated with respect to the pricing of NPK Fertilizers;

(b) The prices of NPK Fertilizers have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c) Purchasers of NPK Fertilizers have been deprived of the benefits of free and open competition; and

(d) Purchasers of NPK Fertilizers paid artificially inflated prices.

132. The purpose of the conspiratorial and unlawful conduct of Defendants and their was to fix, raise, stabilize, and/or maintain the price of NPK Fertilizers.

133. The precise amount of the overcharge impacting the prices of NPK Fertilizers paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

134. By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for NPK Fertilizers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

135. The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## X. CLAIM

**COUNT I**
***Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)***
***(Conspiracy in Restraint of Trade)***

136. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

137. Beginning as early as January 1, 2021, the exact date being unknown, until the date on which any Class is certified, Defendants entered into and engaged in a contract, combination, or conspiracy with regard to fertilizer in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

138. The contract, combination, or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for NPK Fertilizers in the United States and its territories.

139. In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including the following:

(a) Exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, and/or maintain prices of NPK Fertilizers sold in the United States and its territories;

(b) Participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, raise, stabilize, and/or maintain prices of NPK Fertilizers sold in the United States and its territories; and

(c) Participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

140. Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of fertilizer.

141. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for NPK Fertilizers has been restrained, suppressed, and/or eliminated;

(b) Prices for NPK Fertilizers provided by Defendants have been fixed, raised, stabilized, and/or maintained at artificially high, non-competitive levels throughout the United States and its territories; and

(c) Plaintiff and members of the Class who purchased NPK Fertilizers from Defendants have been deprived of the benefits of free and open competition.

142. Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for NPK Fertilizers purchased from Defendants than they would have paid and will pay in the absence of the conspiracy.

143. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

144. Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants to prevent and restrain the violations alleged herein.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class respectfully request the following relief:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Class, appoint the undersigned counsel as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B. That the Court enter an order declaring that the Defendants' actions, as set forth in this Complaint, are illegal and unlawful, including the agreement, contract, combination, or conspiracy alleged herein, and that acts done in furtherance thereof by Defendants be adjudged to have been per se violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C. That the Court award Plaintiff and members of the Class damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D. That the Court issue appropriate injunctive and other equitable relief against Defendants;

E. That the Court award Plaintiff pre- and post-judgment interest;

F. That the Court award Plaintiff their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts, as permitted by law; and

G. That the Court award any and all such other relief as the Court may deem just and proper.

## XII. JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: May 1, 2026

Respectfully Submitted,

*/s/ Nicholas J. Elia*
Nicholas J. Elia
Keith J. Verrier*
Austin B. Cohen*
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: (215) 592-1500
nelia@lfsblaw.com
kverrier@lfsblaw.com
acohen@lfsblaw.com

*Counsel for Plaintiff Gilman Feed Company*

*Pro Hac Vice Application Forthcoming*